## FRANCIS v. BRANSON.

No. 20274. Opinion Filed June 27, 1933.

Rehearing Denied April 17, 1934.

Christy Russell and James N. McTighe, for plaintiff in error.

Fred P. Branson, pro se.

BAYLESS, J. The parties to this appeal will be referred to as they appeared in the trial court.

Herbert Francis, a sole trader doing business under the firm name and style of Francis & Holden, filed an action in the district court of Oklahoma county, against Fred P. Branson, the substance of his petition being that plaintiff owned and operated a printing business devoted almost exclusively to the printing of briefs and particularly briefs in appeals pending in the Supreme Court of Oklahoma; that the defendant was a member of the Supreme Court of Oklahoma; that the defendant in cause No. 17581, styled "Oklahoma City v. Baldwin, 133 Okla. 289, 272 P. 453," to which reference is made without setting the same out in full herein, a case in which the plaintiff was not a party or in any wise interested except to print the briefs of the plaintiff in error, falsely uttered and caused to be widely circulated a false, malicious and unprivileged statement in the form of a dissenting opinion; that prior to the time of the rendition of said opinion the defendant announced from the bench that the plaintiff was a quasi officer of the court, and had been disseminating a malicious libel and slander against the Supreme Court and some of its members, and the defendant stated that he wished it to be known that he would not participate in or consider any case as long as he was a member of the court wherein the briefs had been printed by the plaintiff; that in said dissenting opinion the said defendant had reiterated the statements to the effect that the plaintiff was a quasi officer of the court, that said plaintiff had circulated an article slanderous and libelous as to certain members of the court, that he felt it his duty as a Justice to protect the integrity of the court and public respect for the court; and then proceeded to give the history of certain litigation and quoted several cases which had been heretofore decided, and stated further that so long as he was a member of the court he would refuse to participate in any manner in any case in which the briefs filed in said cause were printed by said plaintiff. Said dissenting opinion was devoted to an explanation of

the defendant's failure to participate in the case and his reasons for refusing to discuss the merits of said case.

Plaintiff further alleged that the defendant filed said dissenting opinion in the office of the Clerk of the Supreme Court and caused the same to be widely published and widely circulated. Plaintiff further alleges that the defendant had continuously and at frequent intervals, particularly in certain counties in the state, appeared before large audiences and reiterated such false and unprivileged statements and boasted that he had by said means ruined plaintiff's business and would continue to do so as long as he remained on the court. Plaintiff further alleged that the defendant, in concert with the Harlow Publishing Company, a competitor engaged in the business of brief printing, had published the said dissenting opinion in pamphlet form together with the statement and the excerpts therefrom, and had caused the same to be circulated throughout the state, and that it was maliciously done with the purpose and design of destroying the business of said plaintiff. That all of these things had been done by the defendant with the malicious, corrupt, and unprivileged design and intention to ruin plaintiff's business. Plaintiff also alleged that the members of the bar and prospective clients were intimidated, and refused by reason of said remarks to have their briefs printed with said plaintiff; that since said dissenting opinion had been filed and circulated, as hereinabove set out, the business of plaintiff had decreased and would be decreased unless the defendant was restrained, and the prayer of the first cause of action is herein set out in the following words:

"Wherefore, premises considered, plaintiff prays on this, his first cause of action, that the court grant a temporary injunction herein, restraining, prohibiting, and enjoining the said defendant, Fred P. Branson, during the pendency of this suit, from in anywise or manner participating as a member of the Supreme Court of Oklahoma, in any cause, matter, or proceeding now pending or hereafter filed in said court; and that on final trial hereof said injunction be made permanent and absolute, and for such other and further relief as to the court may seem proper, and as the law and equity may require, and for costs."

Plaintiff, in his brief, as to his first cause of action, states:

"The defendant was not re-elected, and his term of office has now expired, and thereby was taken from him the means and power with which to accomplish further injury, hence the question of whether we were entitled to the injunctive relief is now a moot question."

Although plaintiff states that the question of the injunctive relief is moot, yet the same was properly before the district court, and inasmuch as we feel that a public question is raised, we do not feel justified in ignoring the same. From the foregoing prayer, it will be noted that plaintiff is seeking to have a district court enjoin the defendant from exercising his right to act as a Justice of the Supreme Court. We feel that all that need be said concerning this question is to quote from article 7, sec. 2, of our Constitution, which defines the jurisdiction of the Supreme Court over inferior courts, as follows:

'The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law."

We, therefore, hold that said provision is conclusive on this question, and that no inferior court has a right to interfere with the Supreme Court or any Justice thereof from exercising jurisdiction over cases pending in the Supreme Court.

Plaintiff for his second cause of action adopts the allegations contained in his first cause of action, and alleges the damage to his business and loss in profits, and asks for judgment in the sum of $36,000 as exemplary damages and $10,196.65 as actual damages.

To this petition a general demurrer was filed by the defendant, and it was sustained by the court.

The plaintiff prosecutes this appeal and urges four propositions, as follows:

"1. The right to conduct a business is property, as is the incidental right to the good will thereof, and the free unimpeded, and unobstructed access of patrons thereof. Acts committed without just cause or excuse, which interfere with or cause injury to either right or both, are unlawful.

"2. The scheme and the acts committed by the defendant to injure and destroy the plaintiff's business were illegal—they were criminal; specifically made so in this state by statute; they were likewise so by the common law; and, independent of their criminal character, they are actionable wrongs.

"3. The defendant's position as a member of the Supreme Court, at the time he committed the acts, does not give him immunity nor shield him from the consequences of his wrongful acts; there being a total ab-

sence of jurisdiction over either the person or the subject-matter, and the want of jurisdiction was known to the defendant.

"4. It is beyond the power of the state, either by its laws or the construction thereof by its courts, or otherwise, to make lawful such a wrong as is described in the petition. It would violate the Fourteenth Amendment."

Plaintiff states in his brief that this is an action based upon the unlawful interference with a person's business, and relies upon the general rule of law as announced in Stebbins v. Edwards, 101 Okla. 188, 224 P. 714, which holds:

"A person has a right to carry on and prosecute a lawful business in which he is engaged without unlawful molestation or interference from any person, and any malicious interference with such business is an 'unlawful act' and an actionable wrong.

"The basis of such an action is the fraudulent and malicious acts of the defendant in interfering with plaintiff's business, and the statements of the means used to effect this purpose all combine to produce a single cause of action, and are not objectionable for duplicity."

The defendant relies upon the rule of law announced in Bradley v. Fisher, 13 Wall. 335, 20 L. Ed. 646, to the effect that a judicial officer cannot be personally sued in a civil action for his acts done as a judicial officer in the performance of his duties.

In the light of these two conflicting contentions, we must carefully analyze the allegations of plaintiff's petition to attempt to ascertain whether he states a cause of action for damages in the second cause of action.

The acts charged to the defendant are: (1) The oral statement, in court; (2) the writing of the dissenting opinion; (3) filing and publishing the dissenting opinion as a part of the court's records; (4) acting in concert with Harlow Publishing Company to publish and circulate the dissenting opinion; and (5) the statements made in political speeches. Each separate charge is predicated upon malice and corruption in connection with the unprivileged character of the statements of the dissenting opinion.

We will consider the first three of these enumerated charges. It is conceded that the Supreme Court of the state of Oklahoma, of which the defendant was a member, had full and complete jurisdiction of the case of Oklahoma City v. Baldwin, supra, and that plaintiff printed the brief for one of the parties to said appeal. This being so, the defendant was clothed with power and discretion in the consideration of said matter, and might and could discuss both the form and substance of the particular brief.

Although the written statement of the defendant is referred to as a dissenting opinion, from an examination of the same it will be seen that it is a statement by said defendant of his reasons for not participating in the opinion. The defendant had a right to disqualify in the case of Oklahoma City v. Baldwin, supra, if the conduct of the plaintiff, known to the defendant, so prejudiced him as to probably influence his opinion, or in order to protect himself or any other member of the court from disrepute. Such being the case, the defendant had a right and the jurisdiction to set out in an opinion or from the bench any reasons that he might have for not participating in said cause, even though by the exercise of such right he exceeded his jurisdiction and that such act was responsible for an injury to said plaintiff. This being so, can he be called upon to account for what he said and did under the facts under consideration?

Defendant relies on the rule as laid down in the case of Bradley v. Fisher, supra. We quote from said case, which reviews the authorities at length on the liability of a judge, in a civil action, for his acts as such judge:

"For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to everyone who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility. Taaffe v. Downes, 3 Moore's, P. C., 41 n. * * *

"Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry. This was adjudged in the case of Floyd and Barker, reported by Coke, in 1608 (12 Coke, 25) where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching the verity of their records, except before the King himself, and it was observed that if they were required to answer

otherwise, it would 'tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations.'

"The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties and, consequently, exciting the deepest feelings, are being constantly determined in those courts, in which there is a great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge. When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision often finds vent in imputations of this character, and from the imperfection of human nature this is hardly a subject of wonder. If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action.

"If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party—and that judge perhaps one of an inferior jurisdiction—that he had decided as he did with judicial integrity; and the second judge would be subjected to a similar burden, as he in his turn might also be held amenable by the losing party. * * *

"Mr. Justice Compton replied: 'It is a principle of our law that no action will lie against a judge of one of the superior courts for a judicial act, though it be alleged to have been done maliciously and corruptly; therefore the proposed allegation would not make the declaration good. The public are deeply interested in this rule, which, indeed, exists for their benefit, and was established in order to secure the independence of the judges, and prevent them being harassed by vexatious actions;' and the leave was refused. Scott v. Stansfield, 3 L. R., Exch., 220.

"In this country the judges of the superior courts of record are only responsible to the people, or the authorities constituted by the people, from whom they receive their commissions, for the manner in which they discharge the great trusts of their office. If in the exercise of the powers with which they are clothed as ministers of justice, they act with partiality, or maliciously, or corruptly, or arbitrarily, or oppressively, they may be called to an account by impeachment and suspended or removed from office. In some states they may be thus suspended or removed without impeachment, by a vote of the two Houses of the Legislature. * * *

"But, if on the other hand, a judge of a criminal court, invested with general criminal jurisdiction over offenses committed within a certain district, should hold a particular act to be a public offense, which is not by the law made an offense, and proceed to the arrest and trial of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject-matter is invoked. Indeed, some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction or that of the court held by him, or the manner in which the jurisdiction shall be exercised."

Defendant also refers to the case of Yaselli v. Goff, 12 F. (2d) 396, wherein an exhaustive opinion is written, and we feel that the language contained therein aptly illustrates our view, and we quote therefrom, beginning at page 399:

"In Fray v. Blackburn, 3 B. & S. 576, a judge of the Court of Queen's Bench was sued for a judicial act, and on a demurrer the point was taken that there was no al-

legation of malice. The plaintiff thereupon moved to amend by introducing an allegation of malice and corruption. The application to amend was denied and in denying it the court said:

" 'It is a principle of our law that no action will lie against a judge of one of our superior courts for a judicial act though it be alleged to have been done maliciously and corruptly; therefore the proposed allegation would not make the declaration good. The public are deeply interested in this rule, which indeed exists for their benefit, and was established in order to secure the independence of the judges, and prevent their being harassed by vexatious actions.' * * *

"In Fray v. Blackburn, 3 B. & S. 576. Chief Baron Kelly, after observing that a series of decisions, uniformly to the same effect, extending from the time of Lord Coke to the present time, established the general proposition that no action will lie against a judge for any act done or words spoken in his judicial capacity in a court of justice, and that the doctrine had been applied to the court of a coroner, and to a court-martial, as well as to the superior courts, said:

" 'It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. This provision of the law is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences. How could a judge so exercise his office, if he were in daily and hourly fear of an action being brought against him, and of having the question submitted to a jury whether a matter on which he had commented judicially was or was not relevant to the case before him?'

"* * * In Cooke v. Bangs, 31 Fed. 640. which was decided in 1887, the question came before the Circuit Court for the District of Minnesota, and the opinion was written by Mr. Justice Brewer, of the Supreme Court, sitting as a Circuit Justice. It was decided in that case that where a justice of the peace, having power to commit for contempt, commits a person for contempt, and on such person being liberated on habeas corpus recommitted him on a fresh warrant for the same offense, the justice was not amenable to a civil action for false and malicious imprisonment, although his action in making the second commitment was erroneous, and although it was alleged that he acted maliciously. In the course of his interesting opinion Justice Brewer said:

" 'In the first place, there is no officer with respect to whose integrity and character the people in this country are more particular than they are in respect to that of a judge. The people insist upon purity of life and integrity of character in the incumbent of that office, and they are as jealous of that as of any other right. A man may vote for a person for some office about whose integrity of life he may have doubt, but he is very loath to place a man in any judicial position as to whose integrity of character he has even a suspicion. Not only that, but the moment that one holding a judicial office is suspected of corruption, or of being actuated by malice, he becomes very rapidly socially ostracized. Whenever the suspicion attaches, it is as ruinous to him as when a suspicion of want of chastity attaches to a woman. Again, he is just as amenable to the criminal law as any private citizen. There is no judge, from the judge of the Supreme Court of the United States at Washington, to a justice of the peace in the smallest township of the state, who, acting on any judicial matter from corruption or from malice, but becomes amenable to the criminal law the same as any other man, and may also be removed from office by proper proceedings. So there is no danger of judges as a class feeling that they are above the law, or becoming independent of the law, or indifferent to the rights of others. This rule, which is founded on experience, is upheld with uniformity by the authorities so far as superior courts are concerned. There is scarcely a dissenting voice in all the long story that has been told in the history of the common law. With respect to all judicial officers—justice of the peace, as well as judges of the higher courts—the settled law of the Supreme Court of the United States, and I think the plain intimation of the Supreme Court of this state, is that, where they act within their jurisdiction, they are not amenable to any civil action for damages. No matter what their motives may be, they cannot be inquired into'."

The facts in the case of Bradley v. Fisher, supra, show that a trial judge, while acting in his capacity as trier of a case pending in his court, at the conclusion of the case, entered an order disbarring an attorney, and upon appeal from this order the Supreme Court of the United States held that the trial judge exceeded his power. But in the case above it also held that he was immune from a civil action based on said act because he was acting in his judicial capacity in a court of justice at the time it was done. In the case of Yaselli v. Goff, supra, the defendant charged in that case was a special assistant to the Attorney General of the United States, who was sued for malicious prosecution by Yaselli because of certain acts done by the defendant in the

performance of his duties with a grand jury, by which grand jury Yaselli and others were indicted. Yaselli charged that the defendant had willfully and maliciously conspired to get himself appointed as such prosecutor in order that he might willfully and maliciously indict the persons whom he sought to punish. The court in that case held that the same immunity attached to a United States attorney, who is at least a quasi official officer, and refused the plaintiff the damages sought.

The plaintiff has cited many cases announced by the courts of almost all jurisdictions in the United States tending to show that a public officer or private citizen cannot interfere with the business or the right to maintain a business, as contended for by the plaintiff, but in none of these cases do the facts involve the acts of a judicial officer in the exercise of his judicial duties within his jurisdiction.

The ultimate ideal of every judge should be the hope of all who suffer and the dread of all who wrong. In passing, it must be said that the above ideal has to a large extent been realized by the judicial branch of our government. Their service has been one of the bright spots in the history of our nation. It is true that there have been in the past, and no doubt will be in the future, judges who have so far forgotten their oaths and their duties that they have failed to maintain this high standard, but from the standpoint of the public's interest we feel that the better policy is to permit an occasional individual to suffer by the arbitrary and temperamental acts of a particular judge than to destroy the independence of the judiciary in holding them liable in civil actions instituted at the will of some dissatisfied litigant for the purpose of harassment or for revenge.

We therefore conclude, as to the first three acts charged, the defendant was acting in his capacity as a Justice of the Supreme Court of the state of Oklahoma within his jurisdiction and power in considering an appealed case, and that in discussing the case, writing his dissenting opinion, and filing and publishing the same as a part of the records of the court in such appealed case, he is immune from attack by civil suit therefor, and his reasons or motive or purposes in such acts cannot be inquired into in such a civil action as herein sought to be maintained.

The charges which we have numbered 4 and 5 fall into a somewhat different class.

The rule of immunity of a civil judge for his acts is best stated in the case of Yaselli v. Goff, supra, in the quotation from Fray v. Blackburn, as follows:

"* * * No action will lie against a judge for any acts done or words spoken in his judicial capacity in a court of justice. * * *

This is a terse statement of the rule and its limitation. We believe that this immunity does not follow a judge when he is not acting in his judicial capacity in a court of justice. Therefore, the acts and conduct of the defendant in acting in concert with someone else to print and publish and to circulate the dissenting opinion, and the making of political speeches, all for the purpose of injuring the plaintiff, do not fall within the rule heretofore announced. However, what we have just said does not mean that the trial court erred in sustaining the demurrer to charges 4 and 5.

There is a presumption of correctness in favor of a judgment of a trial court. We said in Cox v. Warford, 34 Okla. 374, 126 P. 1026:

"All presumptions, in the absence of a complete record, are in favor of the judgment of the trial court."

And:

"Error is never presumed; it must always be shown. And if it does not affirmatively appear, it will be presumed that no error has been committed."

The original case-made filed in this case is missing and it has not been replaced. At the time this case was orally argued before the court, a statement of the case was prepared from the briefs by the writer hereof, and at that time it was announced that the records were not available and that if no complaint was made by the defendant in error, it would be presumed that the petition, as set out in plaintiff in error's brief, was a correct copy of the petition filed in the district court.

Both parties, in their briefs, state that a general demurrer was sustained to the petition. The defendant in error raises no objection to the correctness of the petition as set out in the brief of the plaintiff in error. These facts being true, and as we must proceed to the determination of this matter on points 4 and 5 upon an incomplete record and attempt to reach some conclusion upon the matters which were, or may be presumed to have been, presented to the trial court. We are not in a position to say, however, that our opinion would be different if

the whole record were before us. We are only meeting what is before us as best we can. Both parties state in their briefs that the demurrer filed by the defendant was a general demurrer, by which we understand that it specified ground No. 6 of section 201, O. S. 1931 (sec. 268, C. O. S. 1921). We do not know whether the defendant specified in the demurrer the particulars in which the plaintiff's petition was deficient.

This being so, another presumption is applicable. It is said in 4 C. J. 748:

"Where the record does not show the specific ground on which the court sustained or overruled a demurrer, its ruling may be referred to such grounds as will support the judgment or decree and not to others which would render it erroneous"

—which statement was approved and adopted by us in Coody v. Coody, 39 Okla. 719, 136 P. 754.

What we understand all of the foregoing to mean is: That as there is no record before the appellate court, the judgment must be presumed to be correct and must be affirmed; but, if there is before the appellate court an incomplete but substantial part of the record, or a complete record, without specific grounds of consideration for the general demurrer, it is the duty of the appellate court to search such of the record as is before it, and if a reasonable hypothesis or ground to sustain the ruling of the trial court can be found, it must be adopted. This search is made because it is presumed that such reasonable hypothesis will be found rather than that it will not be found.

It was stated in the oral argument that three district judges, sitting en banc, heard the general demurrer presented and considered it. If three district judges doubted that the petition stated a cause of action, undoubtedly the application of this presumption to this situation is reasonable and we must search the record in an effort to find support for their ruling. An examination of the allegations relating to charges 4 and 5 leads us to believe that conclusions are pleaded in lieu of essential pleadable facts. The defendant in substance is alleged to be: "Going about," naming certain counties but not specific places or times, "calling attention to and reiterating" the matters before alleged, and "boasting" that he has ruined plaintiff's business by these means; and "in concert with Harlow Publishing Company" falsely uttering, publishing, etc., the dissenting opinion. These allegations are certainly no stronger or better than those condemned as conclusions in Green v. Victor Talking Machine Co., 24 F. (2d) 378, 59 A. L. R. 1091, wherein it is said:

"The complaint sets forth (among other allegations) * * * that defendant sought to cause employees of Pearsall Company to leave it, gave its competitors confidential information concerning its business and finances, damaged its credit and by secret and unfair means interfered with its business. * * * The allegations of disclosure of confidential information, damage to credit, and unfair interference with business are mere conclusions. * * *"

Even if there could be any doubt on this question, that doubt must be resolved against the pleader. This rule was announced by us in Lusk v. Porter, 53 Okla. 294, 156 P. 224, when we said:

"In a case where a pleading is challenged before trial by demurrer, its language, where doubtful, will be construed against the pleader upon the ground that, as he selects the language, he should make his meaning clear. * * *"

This rule is followed in the later case of Fretz v. City of Edmond, 66 Okla. 262, 168 P. 800, and MacInnis v. Perram, 103 Okla. 15, 229 P. 168.

The rule of doubt resolved against the pleader is followed by yet another presumption. The plaintiff is not shown to have amended his petition, because we are quoted the purported original petition unaltered. The plaintiff does not allege that he asked for permission to amend the petition and was refused such permission. Therefore, it must be that he did not ask for such permission and elected to stand upon the petition as presented to the trial court in the present form in which we find it. The presumption is as stated by us in Lusk v. Porter, supra:

"* * * Where in such a case a demurrer is sustained on account of the insufficiency of a pleading, and no application for amendment is made, it will be presumed that the facts to justify it do not exist."

Therefore, we find, in so much of the record as is before us allegations in the petition, probably in the form of conclusions rather than essential pleadable facts, the doubt about which probably must be resolved against the pleader; the existence of which conclusions renders the petition subject to demurrer; that a general demurrer was filed and sustained, but the specific ground is not pointed out; the added presumption that the ground upon which it

was sustained (pleading conclusions rather than facts) was called to the attention of the pleader, and he not having asked to amend or strengthen his petition, that such facts are presumed not to exist; added to all of which is the inhering presumption of correctness of the ruling of the trial court (especially applicable to the ruling of three district judges sitting en banc); all of which causes us to be of the opinion that the ruling of the trial court was correct.

The judgment of the trial court in this matter is, therefore, affirmed in all respects.

CULLISON, V. C. J., and McNEILL, and WELCH, JJ., and GORE, Special J., concur. SWINDALL, OSBORN, and BUSBY, JJ., dissent. RILEY, C. J., disqualified. ANDREWS, J., not participating.

---

SWINDALL, J. (dissenting). The writer cannot agree with the conclusions of the majority of the court in affirming the trial court, but to make clear the grounds of his dissent, it is necessary to state in a general way what it was that the plaintiff's petition charged. We take this from the brief of the plaintiff in error, the court having stated that it would consider that to be a true copy of the petition and the defendant not having contended that it was not. Further, it should be observed that the order of the trial court was upon a general demurrer. Both parties admit that. So, the only question to be determined is whether or not the petition stated facts sufficient to constitute a cause of action, and since the plaintiff complains of the order, he has the burden of convincing us that the petition did allege facts sufficient to constitute a cause of action.

In his petition the plaintiff alleged that he was and for years had been a printer engaged in the business of printing briefs; that at all of the times of the commission of conduct charged against the defendant, the defendant was a member of this court; that when the opinion of this court in the case of Oklahoma City v. Baldwin was handed down, that being a case in which the plaintiff was not a party, and with which he had no concern and no connection other than that he had as a printer printed the briefs of the plaintiff in error, the defendant falsely stated that the brief printer, meaning the plaintiff, had for some time been disseminating a malicious libel and slander against this court and some of its members, having reference to the fact that the plaintiff had published an opinion of the Criminal Court of Appeals in a case mentioned in the petition, and the complete argument of one of the attorneys in a case theretofore tried in the district court of Oklahoma county, and that the defendant wished it known that he would not participate in or consider any case in this court so long as he might be a member, in which the briefs might be printed by said printer, and that later, on the same date, he stated that the plaintiff was the printer he had in mind in making those remarks.

The plaintiff further alleged that the defendant published a dissenting opinion in said case of Oklahoma City v. Baldwin, and set forth the dissenting opinion in full in the petition, alleging that it was false, defamatory, and malicious, the dissenting opinion briefly being of this purport: That the defendant had announced his dissent and his reasons, and had stated that he would hand down a written dissenting opinion stating his views. That he disagreed with the conclusion of the majority on the ground that the majority opinion overlooked certain controlling decisions, but that he would not discuss the matter because the present plaintiff had printed the briefs of the plaintiff in error. It then recited that brief printers had been permitted to obtain extensions of time for parties in which to print, serve, and file briefs, and were agencies of the parties, and that the briefs of these printers became the agencies through which the court considered cases pending before it. It asserted that the court should protect itself against slanderous and libelous conduct of persons connected with it, and then charged the plaintiff with the making of a report which was untrue and unfair in that he printed only the opinion in one case and only one argument in another, and did not print other matters which would have fairly represented the whole of the proceedings. The opinion then went on as follows:

"The object of this circulation of a document full of false statements could be only one of slander against an instrumentality of government, the highest judicial tribunal in the state, in carrying out a well-fixed purpose, conceived at the inception of the matter out of which it grew, that this court should be intimidated by the use of money, big money, to the end that its members would not be free to apply the law, as it is, to the rights of litigants who may be driven here for their protection, which intimidation, if permitted,

is a destruction of the constitutonal Supreme Court of Oklahoma, without whose protection no citizen would remain in the state longer than he could remove therefrom. To consider any product at the hands of, coming through, or produced by, a firm which is a party to such a nefarious purpose, in the first instance for hire, and in the second instance gratuitously, is to acquiesce in the right to do so, and as long as the writer is a member of this court—long or short—such products will be thrown in the waste basket when they reach his desk, and treated just as the writer would refuse to listen to any lawyer present a cause in this court who had repeatedly circulated a knowing slander and libel on the court or any member thereof, or judge of any court in this state."

The next paragraph charged the filing by the defendant of a copy of said opinion in the office of the clerk of this court on April 7, 1928.

The paragraph charging the writing of the dissenting opinion also charged the defendant with maliciously causing it to be circulated, but for the present purpose we will consider that no more was meant at that point than that it was circulated by being printed in the regular printed reports of decisions of this court, and not complicate the allegations in the first three subdivisions, having to do with remarks from the bench, uttering the written opinion, and filing of it in the clerk's office, by considering that anything so far had been charged which occurred outside of a judicial proceeding, if what was done can properly be considered as having been done in a judicial proceeding.

The majority opinion considers those paragraphs as merely charging something done in a judicial capacity, in a judicial proceeding, and concludes that the conduct was absolutely privileged. It is true that this conduct would be held to be absolutely privileged and as within the terms of the rule as usually and often stated, asserting that a judge is exempt from suit for anything done upon the bench or in the course of a judicial proceeding of which the court has jurisdiction, an excess of jurisdiction not destroying the privilege. However, in all the writer's search he has not found a case going so far on the facts as this one, considered from the standpoint of what any reasonable man might conclude as to what, if anything, the plaintiff did in the printing and publishing of the opinion and argument, with a matter over which the court had jurisdiction. We think that the true rule is correctly stated in the language

of Halsbury's Laws of England, vol. 23, Public Authorities and Public Officers, p. 327, citing Primrose v. Waterson (1902) 4 F. (Ct. of Sess.) 783, per Lord MacDonald, at page 793, that rule being stated by Halsbury as follows:

"Probably the correct rule is that words are protected unless so clearly irrelevant that no man of ordinary intelligence and judgment could honestly dispute that they had no connection with the case in hand."

Certainly the remarks had nothing to do with the issues in the case of Oklahoma City v. Baldwin, and no reasonable man could think that he could as a judge refuse to consider the merits of a case just because of the matter of whom the party employed to print his brief. The accuracy of the brief was not drawn into question by the opposing party, but the judge sought to make it appear rather as the brief of the printer than the brief of the party for whom it was printed. Since the writer cannot conclude that any reasonable men could think that a dissent or refusal to participate in a case could be thought to be made to turn upon the fact that the printer had once printed publications which the judge thought were not fair and accurate reports, we view this case in no different light than one in which in a controversy between A and B, with which C is not concerned, and with which he was in no way connected, the court should refuse to adjudicate the rights of A and B, taking advantage of his refusal to indulge in slanderous matters as to C, following that up by reducing the slander to writing and converting it into libel. If this was not actionable, it certainly went to the very verge of privilege. But it is unnecessary to determine whether absolute privilege will go to such extreme length, for such publications were only the beginning of many publications charged against the defendant, all of the others having clearly been outside of court and outside of any judicial proceeding, which leads the writer to consider what the plaintiff alleged in what the majority terms paragraphs 4 and 5, which the plaintiff designated as subdivisions "(d)" and "(e)". These allegations are what the majority opinion termed mere conclusions. They are as follows:

"(d) Has been and is, as plaintiff is informed and believes and upon such information and belief alleges, continuously since said last mentioned date and at frequent intervals going over the state of Oklahoma, and particularly throughout Creek, Lincoln, Muskogee, McIntosh, Okfuskee and Okmul-

gee counties in said state, and in public political speeches, and before large numbers of people, calling attention to and re-iterating the matters mentioned in the three preceding subdivisions hereof, and using vile, obscene, opprobrious epithets of and concerning the plaintiff (same being too obscene to set forth in a pleading) in reference to and on account of the fact that this plaintiff had printed and published the aforesaid opinion and argument; he, the said Branson, boasting that he had by the aforementioned means ruined this plaintiff's business and would continue so to do so long as he remained on said court either in his present term or any other term hereafter.

"(e) Has been and is, as plaintiff is informed and believes and therefore alleges, in concert with Harlow Publishing Company, a competitor of this plaintiff, likewise engaged in the business of brief printing, falsely uttering, publishing and causing to be widely circulated, of and concerning this plaintiff and his business, the aforesaid false, malicious, defamatory and unprivileged statement falsely imputing and charging this plaintiff with the commission of crime and causing the same to be printed and published in pamphlet form under the false, malicious, defamatory and unprivileged caption and cover as follows: 'Dissenting Opinion of Chief Justice Fred P. Branson in Case of Oklahoma City v. Baldwin. Copy of dissenting opinion filed in the above case by Chief Justice Fred P. Branson, announcing the important rule that brief printers, appearing before the Supreme Court for purposes connected with the printing, filing and serving of briefs, are instrumentalities of the Supreme Court and agencies of attorneys and litigants employing them, and as such are engaged in the performance of functions properly belonging to lawyers as sworn officers of the Supreme Court, and, where such brief printers are guilty of conduct unbecoming such relation, the Supreme Court may refuse to consider briefs filed by them in pending cases,' which pamphlet, so captioned and containing such statement, was by them caused to be widely and generally distributed and circulated throughout the state of Oklahoma."

The plaintiff then alleged that all of the conduct charged against the defendant had been done to disparage the plaintiff's business and as threats to his patrons and would-be patrons, causing them to hazard their rights involved in litigation should they patronize plaintiff, and denying them the right to have their cases properly considered on the merits if they had patronized the plaintiff, all for the purpose of destroying and ruining the plaintiff's business.

The majority opinion concedes that outside of the proceeding the defendant stood upon different ground with reference to defamatory utterances, and it cannot be successfully contended that he could assert outside of court the defamatory utterances contained in the so-called dissenting opinion, nor could he ever make a fair and true report of his dissenting opinion, if moved by malice, for even the doing of that is the exercise of only a prima facie, qualified, or conditional privilege at most, and is destroyed by actual malice, and so far as concerns reasserting as fact what he had asserted in the opinion, such publications would not be even qualifiedly privileged.

It is unnecessary to go further into these phases, for the majority opinion finally turned in the last analysis upon its conclusions that what was alleged in paragraphs "(d)" and "(e)" were not facts, but mere conclusions.

The opinion premised that by stating that it was deciding upon an incomplete record, but the record was certainly complete enough to enable the court, and to require this court, to decide upon the merits on the plaintiff's assignment that the court erred in sustaining the demurrer to his petition. The court announced to the parties that since the record had been lost, it would consider that the petition as printed in the plaintiff's brief was a true copy of the original unless the defendant complained, and the defendant did not complain. Both parties admitted that the demurrer was a general demurrer, by which the majority correctly concluded that the ground was that the petition did not state facts sufficient to constitute a cause of action. So, the majority considers that the record is incomplete in that it does not indicate upon what ground the defendant contended that there was a failure to state facts sufficient to constitute a cause of action, or upon what ground the court held that there was such a failure, if the demurrer or order sustaining the demurrer set forth any such specific grounds. As to that, a statement of grounds was unnecessary, and, more than that, is unusual, and whatever grounds there may have been certainly are known to the defendant, and all that he urged in his briefs was that what he did was absolutely privileged, and in the briefs he wholly failed to give attention to the allegations of paragraphs "(d)" and "(e)."

Nor do we have to deal especially with presumptions. The plaintiff has assigned er-

ror in sustaining a general demurrer to a certain petition, this court knowing what were the allegations of the petition, and that the demurrer was general, and since the order was against the plaintiff, he had to assign error, and the burden is upon him to convince this court that the trial court erred. If this court is not convinced that his petition alleged facts sufficient to constitute a cause of action, he will lose; but if this court is convinced that the petition did state facts sufficient to constitute a cause of action, he should win. What the majority say about the fact that three judges collaborated in sustaining the demurrer is nothing but a counsel of caution, and it cannot prevail against a conclusion that the petition did state facts sufficient to constitute a cause of action.

In following its own counsel of caution, the court finally concluded that the petition in paragraphs "(d)" and "(e)" stated mere conclusions, and was, therefore, subject to demurrer.

In support of its conclusion the court relied upon Green v. Victor Talking Machine Co., 24 Fed. (2d) 378, 59 A. L. R. 1091, which was decided upon the broad ground that the tort, if any, was committed against the corporation and not against the stockholder who sued. The majority opinion quoted as follows:

"The complaint sets forth (among other allegations) * * * that defendant sought to cause employees of Pearsall Company to leave it, gave its competitors confidential information concerning its business and finances, damaged its credit and by secret and unfair means interfered with its business. * * * The allegations of disclosure of confidential information, damage to credit, and unfair interference with business are mere conclusions;"

Immediately following this last semicolon, the court, in the same sentence, said:

"but, even if they were treated as adequately pleaded, they would be subject to the same objection that they charge a breach of duty owing to the corporation rather than to the shareholders,"

—a matter to which the court had referred in an earlier part of the opinion. The court's opinion as to conclusions was nothing but dictum; its conclusion was not based upon careful consideration or supported by cited authority. Before giving its authority in the decision in this case, one should check its conclusions carefully and investigate much further as to this matter of what are conclusions and what are considered as allegations of ultimate fact, for ultimate fact is

what one should allege, and not evidentiary fact, the means whereby he seeks to prove the ultimate facts.

The investigations of the writer have convinced him that what courts have in mind in determining whether an allegation is one of ultimate fact or a conclusion of law, is a mental predominating impression based upon the ordinary and usual use of the expressions before it. Wherever the law requires certain types of facts to exist to constitute a cause of action, a mere conclusion which would be justified only by the existence of such facts necessarily makes the element of question of law predominate. For instance, certain elements are necessary to constitute the tort deceit, often termed "fraud," and unless the elements are charged as facts, the allegations cannot be sufficient, so that charging that a defendant made a representation or a false representation fraudulently does not sufficiently in fact charge the tort deceit.

On the other hand, it is no objection to an allegation that the evidentiary facts offered may be such that the existence of one or more of them turns upon a question of law. Status is matter of fact, and an allegation that one is the wife of another, or one is the husband of another, or that two persons are partners, is regarded as an allegation of fact, and yet, oftentimes when issue is made upon it and the evidence is all in, we find that the status of wife or husband may turn upon the fact of divorce, and that may present a situation where the fact turns upon a question of law involved in deciding as to the validity of divorce proceedings, as oftentimes on the issue of partnership the facts necessitate a decision upon a question of law before final conclusion as to the ultimate fact can be made.

Whether in a certain case the allegations present to the judge's mind an indication of a question of law sufficiently predominant to cause him to view the assertion as a conclusion of law is often a question upon which judges may reasonably differ, and as a matter of fact the holdings depend much upon precedent.

"It may not be possible to formulate a definition that will always describe what is a mere conclusion of law, so as to distinguish it from a pleadable ultimate fact, or that will define how great an infusion of conclusions of law will be held to enter into the composition of a pleadable fact. Precedent and analogy are the only guides. * * * And in holding one class of inferences as facts to be pleaded, and another as conclu-

sions of law to be avoided, courts may have been often governed more by precedent than by a substantial difference in principle. But it has been quite generally held that the question of negligence in a particular case is one of mingled law and fact; that when we speak of the act as 'negligent' or 'careless', according to the common use of language, we state, not simply a conclusion of law, but likewise state an ultimate fact inferable from certain other facts not stated." Clark v. Chicago, M. & St. P. Ry. Co., 28 Minn. 69, 9 N. W. 75.

"It is not always an easy matter to determine whether a particular statement in a pleading is a statement of facts which ought to be pleaded or a conclusion of law which should be avoided. So far as we know, no one has attempted to formulate a rule which will enable one in all cases to determine whether a statement belongs to one class or the other. The books abound with cases where it became necessary to determine whether a particular statement was a statement of ultimate fact or an inference of law. But these cases, while useful as mere precedents, are of little value as authorities, except where the same statement occurs under like circumstances." Foss v. People's Gas Light, etc., Co., 241 Ill. 238, 89 N. W. 351.

While we may well expect judges to differ in border-line situations, an allegation may be so far from the line that there can be no reasonable ground for difference in opinion if the allegations are considered in the light of the question whether or not a knowledge of the law is fairly supposed to be required in the determination of fact in the particular case, which depends upon the usual impression from the use of the words.

We may also admit that in the allegation of what may be considered matter of fact rather than a conclusion of law, the allegation may be of a character such that it presents to the mind rather opinion or conjecture, but whether such allegations would render a petition subject to demurrer or merely to a motion to make more definite and certain need not be considered, for a consideration of what the plaintiff alleged no more presents such a situation than it does one of allegation of conclusions of law.

The writer can find nothing but allegations which are allegations of ultimate fact, and an examination of them seems to clearly indicate that with no reasonable room for doubt. He has searched in vain for allegations which could properly be termed conclusions of law, and in vain for what might be classed as mere opinion or conjecture

from facts in the pleader's mind and not disclosed, and can find neither.

He alleged that continuously (fact) from time to time (fact) going over the state, and especially in certain named counties (fact, although the fact might turn upon a necessity of reference to the provisions of law establishing the boundaries of the state and of those counties), in public political speeches before large numbers of people (fact), he called attention to and reiterated (fact) the matters mentioned in the three preceding subdivisions hereof (fact, and not at all indefinite by omitting to include the word "all" to make it read "all the matters").

He also alleged in paragraph "(e)" other publications made in concert with the Harlow Publishing Company, and in considering those publications we may ignore the question of whether the conduct of Harlow Publishing Company was done with a view to damage the plaintiff's business, for it is alleged clearly that the defendant, the one sued, had such intent. Here again we find nothing but allegations of fact, and no conclusions of law, or mere conjecture or opinion originating in facts in the pleader's mind and undisclosed. To act in concert is to act by agreement. That is the proper sense of a word of common and ordinary use. Further, the allegation that this pamphlet, consisting of the dissenting opinion and the commenting caption, was widely circulated and circulated throughout the state, charges publication, for charging distribution and circulation of printed matter implies delivery to persons and not to some other form of animate life, and not to scattering the printed matter through the streets and on the highways and byways, without regard to delivery to persons.

The word "reiterate" in subdivision "(d)" charges fact, and in normal sense means that what he had before asserted or said he again asserted and said, and it means that what he had asserted as fact he again asserted as fact, which would make the publications outside of the proceeding defamatory publications privileged in no sense whatever. On the other hand, if we should concede that the word might be properly interpreted to mean merely that he repeated what he had before uttered, not by way of new assertion of fact, but merely by way of report, at most this making of a fair and accurate report is only prima facie, qualifiedly, or conditionally privileged, and the mere reading or repeating it before others, if moved by actual malice, would destroy the privilege,

for the plain reason that the report was not moved by public interest alone. Whatever might be argued as to the indulgence in profanity and obscenity in a frenzied interest in the public weal, it cannot be denied that the plain declaration of intention and purpose of damaging the business of the plaintiff and an intention to continue to do so, sufficiently charges actual malice to negative conditional privilege to even make a fair and true report.

Manifestly the petition goes beyond merely stating a cause of action for defamation. It charges damage to the business of the plaintiff by wrongful means, defamation and threats. Had no wrongful means been charged, the connection of the Harlow Publishing Company might be material, but we do not have to decide whether a conspiracy to damage the plaintiff's business, rather than the act of one alone, would be necessary if the means used were lawful and not unlawful. The petition charges damages by unlawful means, and it certainly states a cause of action against the defendant.

Even considering the allegations of paragraph "(d)" in using the word "reiterate" as charging no more than the making of a report of the dissenting opinion, and assuming that it was fair without also reporting the majority opinion to show how little this dissenting opinion had to do with what was before the court, the very sort of conduct, incomplete report, which the defendant took as an occasion to so violently defame the plaintiff, and conceding that the making of a fair report is one sort of privilege as to which malice is not presumed, being a sort of privilege recited in section 497, C. O. S. 1921, which distinguishes it from other sorts of conditional privilege in that as to those not expressly listed in that section malice is presumed, since the plaintiff sufficiently alleged actual malice, such requirement was amply met by his allegations, for he not only alleged malice in an ultimate manner, by using the word "maliciously," but charged facts which if true are, as a matter of law, sufficient to constitute actual malice.

It seems to the writer that the majority, having been of the same opinion of the writer as to the difference in situation of the defendant as to what he did outside of the proceeding, which he understands to be so from the admission in the majority opinion, the majority themselves jumped to a conclusion in deeming that the allegations in the petition were mere conclusions rather than sufficient allegations of ultimate fact.

For the foregoing reasons, I most respectfully dissent. I am authorized to state that Mr. Justices OSBORN and BUSBY concur in the views expressed herein.