## COCHRAN v. COUZENS.

### No. 4934.

Court of Appeals of District of Columbia.

Argued May 6, 1930.

Decided June 2, 1930.

Harry Friedman, of Washington, D. C., for appellant.

F. D. Jones and Joseph E. Davies, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice.

Appeal from a judgment in the Supreme Court of the District, in an action for slander, sustaining defendant's (appellee here) motion to dismiss for want of jurisdiction.

The declaration discloses that on the 12th of April, 1928, plaintiff was a tax consultant engaged in the practice of his profession in the District of Columbia, and that defendant was a United States Senator from the state of Michigan in attendance upon the meetings of the first session of the Seventieth Congress of the United States; that in 1919 defendant sold a portion of the capital stock of the Ford Motor Company which he long had owned, and filed an income tax return with the Bureau of Internal Revenue charging himself with the accruing profit; that prior to such sale a valuation as of March 1, 1913, had been placed on the stock by the then Commissioner of Internal Revenue, upon which valuation the defendant had computed his profit; that on the 12th of March, 1925, the then Commissioner of Internal Revenue assessed the defendant and other holders of such stock an additional tax liability, based upon a valuation of the stock as of March 1, 1913, different from that fixed in the earlier valuation; that the additional tax liability approximated the sum of $30,000,000; that from this assessment an appeal was prosecuted before the United States Board of Tax Appeals; that thereafter the plaintiff consulted with the defendant on two occasions; and that the defendant did "in the chamber of the Senate of the United States * * * in the course of a speech but not in the course of a debate on the floor of the Senate * * * unofficially and not in the discharge of his official duties as a Senator of the United States * * * of and concerning a subject not then and there pertinent or relevant to any matter under inquiry by the said Senate of the United States, maliciously, wilfully, falsely and wrongfully speak, publish and declare of and concerning the plaintiff and of and concerning the conduct of the plaintiff in his said profession and vocation, the following false, scandalous, malicious and defamatory slander to wit."

The alleged slanderous words were to the effect that defendant, after being approached by plaintiff, had secured information that plaintiff "was quite well known around Washington as being one of the men who knew the inside tax game"; that he was a close friend of an employee of the Internal Revenue Bureau, and that the defendant had his secretary telephone plaintiff that he (defend-

ant) was not interested in the matter; that plaintiff persisted and went to the office of defendant the following day, and was asked by defendant what interest the above-mentioned employee had in the case. Plaintiff admitted that he had conferred with this employee about plaintiff's proposition to defendant; that thereupon the defendant dismissed plaintiff, and thereafter wrote the Commissioner of Internal Revenue concerning plaintiff's activities in the case. The Senator then said he desired to emphasize what he considered a perfectly logical conclusion—that plaintiff knew of the earlier action of the Bureau with reference to the valuation of his stock, and that no one else outside of the Department had such knowledge; that "it is apparent that this information was to be delivered to me if I would arrange to pay 5 per cent. on some thirty million of assessments made against my associates and myself. In other words, this former clerk who had inside information of the bureau was to obtain a fee of about $1,500,000 for his services."

Article 1, § 6, of the Constitution, provides that in all cases, except treason, felony, and breach of the peace, Senators and Representatives shall "be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."

It is manifest that the framers of the Constitution were of the view that it would best serve the interests of all the people if members of the House and Senate were permitted unlimited freedom in speeches or debates. The provision to that end is, therefore, grounded on public policy, and should be liberally construed. Presumably legislators will be restrained in the exercise of such a privilege by the responsibilities of their office. Moreover, in the event of their failure in that regard, they will be subject to discipline by their colleagues. Article 1, § 5.

In Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, the court considered whether a resolution offered by a member is a speech or debate within the meaning of article 1, § 6, and whether the report made to the House and the vote in favor of a resolution are within its protection. The court said (page 201 of 103 U. S.): "If these questions be answered in the affirmative, they cannot be brought in question for their action in a court of justice or in any other place. And yet if a report, or a resolution, or a vote is not a speech or debate, of what value is the constitutional protection?"

The court then observed that, while the framers of our Constitution did not adopt the lex et consuetudo of the English Parliament as a whole, "they did incorporate such parts of it, and with it such privileges of Parliament, as they thought proper to be applied to the two Houses of Congress."

The court then quoted from the opinion of Lord Denman in Stockdale v. Hansard, 9 Ad. & E. 1, as follows: "The privilege of having their debates unquestioned, though denied when the members began to speak their minds freely in the time of Queen Elizabeth, and punished in its exercise both by that princess and her two successors, was soon clearly perceived to be indispensable and universally acknowledged. By consequence, whatever is done within the walls of either assembly must pass without question in any other place. * * *"

The court then observed: "Taking this to be a sound statement of the legal effect of the Bill of Rights and of the parliamentary law of England, it may be reasonably inferred that the framers of the Constitution meant the same thing by the use of language borrowed from that source."

The court then reviewed American decisions, including Coffin v. Coffin, 4 Mass. 1, 3 Am. Dec. 189, relied upon by appellant, and concluded: "It seems to us that the views expressed in the authorities we have cited are sound and are applicable to this case. It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it."

We regard the decision in Kilbourn v. Thompson as controlling here. Under the declaration the words forming the basis of plaintiff's action were uttered in the course of a speech in the chamber of the Senate of the United States, and were absolutely privileged and not subject to "be questioned in any other place." The averment that these words were spoken "unofficially and not in the discharge of his official duties as a Senator" is a mere conclusion and entirely qualified by the averment that they were uttered in the course of a speech.

Judgment affirmed, with costs.
Affirmed.