Stuart S. BOWIE, Individually and as candidate of the Democratic Party for the office of Representative from the 7th Congressional District of Pennsylvania in the Congress of the United States et al.

v.

Lawrence G. WILLIAMS et al.

Civ. A. No. 72–1605.

United States District Court,
E. D. Pennsylvania.

Oct. 20, 1972.

John M. Gallagher, Jr., Upper Darby, Pa., for plaintiffs.

Arthur Levy, Chester, Pa., for Williams.

Anthony R. Semeraro, Media, Pa., for Committee.

Barton A. Hertzbach, Asst. U. S. Atty., Philadelphia, Pa., for Klassen.

## OPINION

DITTER, District Judge.

This case concerns the extent of a Congressman's privilege to use free or "franked"[1] mail to send a newsletter to his constituents.

In 1966, the Seventh Congressional District of Pennsylvania elected Lawrence G. Williams to be its representative in Congress. He has served in this

---

1. A frank is an "autographic or facsimile signature . . . (of those) authorized . . . to transmit matter through the mail without prepayment of postage . . . ." 39 U.S.C. § 3201(3).

capacity to date and is presently running for reelection. Since 1967, Congressman Williams has mailed a "Washington Report" to the residents of his district. This newsletter contains the Congressman's views, positions, and comments about legislative and governmental affairs as well as discussions of the issues of the day. Normally it is sent every other month, although eight editions were published and delivered in 1970. Over the years, 35 "Reports" have been distributed through the mails using the Congressional franking privilege[2] and a simplified form of address, "Postal Patron Local,[3] 7th Congressional District, Pennsylvania." This type of address is authorized by the postal regulations, 32 C.F.R. 122.4(d)(2), promulgated under the authority granted in 39 U.S.C. § 401(2).

Asserting federal jurisdiction under 28 U.S.C. § 1339, which allows district courts to hear all civil actions under United States statutes involving the Postal Service, Stuart S. Bowie, Congressman Williams' opponent in this year's election, has attacked the use of the frank to mail the "Washington Report." Candidate Bowie alleges that the newsletter is campaign material and as such cannot be a Congressman's correspondence on official business for which free mailing privileges are allowed by 39 U.S.C. § 3210. Moreover, the plaintiffs contend that, even though the report was printed in the Congressional Record as the result of a speech by Representative Williams, such publication is in "bad faith." Thus, plaintiffs claim that distribution cannot be made within the terms of 39 U.S.C. § 3212, which allows a member of Congress to mail any portion of the Congressional Record under his frank. Representative Williams is also accused of lending the franking privilege to his reelection committee and its campaign treasurer, John Fielding, in violation of 39 U.S.C. § 3215. Postmaster Elmer T. Klassen was joined as a defendant because the Postal Service delivered the report, sent as first class mail,[4] and because Bowie was denied the privilege of using the "Postal Customer Local" type of address.

On this basis the plaintiffs ask the court to issue a declaratory judgment that Congressman Williams has abused the franking privilege. Furthermore, they ask for an injunction prohibiting the use of the frank for:

(1) further mailing of the "Washington Report" by the Congressman or his campaign organization;

(2) the mailing of any documents for distribution to the voters of the Seventh Congressional District of Pennsylvania, except responses to questions soliciting views;

(3) the mailing of any campaign literature; and

(4) any correspondence not on official business. At the same time Bowie demands an order allowing him to use the simplified form of address for his campaign material. In addition, the plaintiffs contend that, since the "Report" is campaign literature, it was published in violation of a criminal statute, 18 U.S.C. § 612, because the names of those responsible for its issuance were not disclosed. Therefore, relief in the form of an injunction requiring this disclosure and damages is requested. These damages are claimed to be $297,000. for

---

2. A Congressman may send under his frank:
   1. "matter . . . upon official or departmental business, to a Government official." 39 U.S.C. § 3210(1).
   2. "correspondence . . . upon official business to any person." 39 U.S.C. § 3210(2).
   3. " . . . all public documents printed by order of Congress." 39 U.S.C. § 3211.

4. " . . . the Congressional Record, or any part thereof, or speeches or reports therein contained." 39 U.S.C. § 3212.
   5. "Seeds and . . . reports emanating from the Department of Agriculture . . ." 39 U.S.C. § 3213.

3. Now "Postal Customer Local" 39 C.F.R. 122.4(a)(2)(a) (1972).

4. See Paragraph 17 of the Complaint.

<br>

the taxpayers of the United States, $300,-000. in punitive damages for the government, and $297,000. for Candidate Bowie and his organization. The figure, $297,000., is alleged to be the cost of mailing all 35 issues of the newsletter.

In response to these broad and conclusionary accusations, hurled in the context of a political campaign, all the defendants have moved to dismiss or in the alternative for summary judgment. The motion of the Congressman and his organization (hereinafter referred to collectively as Williams) will be considered first, followed by the Postal Services' motion.

## THE WILLIAMS MOTION

After considering oral argument, I find only the June, 1972, edition of "Washington Report" is specifically attacked. Seventeen out of its 95 lines are devoted to explaining the background of an organization which was purportedly opposing Congressman Williams' re-election. This is the only reference to the present campaign in this edition. Other elections are mentioned in three additional issues.[5] The February, 1971, and December, 1970, "Reports" contain 12 and nine lines respectively discussing charges made during the previous election contest. The May, 1970, publication contains 19 lines of response to a newspaper editorial, published before the Congressman had filed for reelection in that year. These three responses to attacks concern different campaigns and are much too remote to have any bearing on this action. The remaining "Reports" are made up of information, explanations, views, positions, requests to hear

from the constituents, offers of assistance, and photographs.[6] Each edition was prepared by Representative Williams' staff and not by his campaign committee.[7]

Disregarding for the moment any technical requirements for the use of the frank or a simplified address form, it is clear that communication between a legislator and those who reside in his district is essential to the concept of representative government. Implicit in the very name itself, "representative government," is the thought that there will be an exchange of ideas and a free flow of information between Congressman and constituent. Every one of Mr. Williams' votes, all his expressions of opinion, and each aspect of his committee-work may please some voters and enrage others—providing they know what he has said and done. Part of a Congressman's responsibility to those he represents is to keep them informed: McGovern v. Martz, 182 F.Supp. 343, 348 (D.C.1960).

Broadly interpreted, all a Congressman reports to the people has partisan and political overtones. He must face the electorate every two years and he knows it. In this context, all he does could be called campaigning. The only way a Congressman might avoid the implication that he is constantly soliciting votes would be to do and say nothing—hardly the way to serve his district or adequately discharge the responsibilities of high office. The publication of a newsletter is a convenient way for a Congressman to fulfill the duty to keep his constituents apprised. Through this media, he may win some votes and lose

---

5. Copies of 33 of the "Reports" are attached to the Complaint.

6. Plaintiffs assert that photographs of Congressman Williams in the "Reports" show the campaign nature of the mailings. They allege the pictures barely meet Post Office guidelines. Prior to December, 1968, the Post Office issued advisory opinions on the propriety of using the frank for specified mailings. At that time, one criteria dealt with picture size.

The giving of advisory opinions having been discontinued, the vitality of such a standard is questionable. Nonetheless, plaintiffs' contention is without merit because the pictures and their captions tell their own story. Moreover, the "requirements" of the now defunct guidelines were met, not exceeded.

7. First Affidavit of James E. Brookes, attached to Motion to Dismiss, Docket No. 16.

others. The fact that a Congressman hopes the balance will tilt in his favor does not make the providing of information any the less a part of his overall responsibility.

The argument that a Congressman's sending information to his constituents amounts to a distribution of campaign literature per se is without merit. If it were valid, the use of the frank would be so severely limited that it would be useless. Nothing could be sent without the prepayment of postage, under plaintiffs' theory, except replies to letters received. Plaintiffs are really saying that a Congressman should be required to pay personally almost all the expenses of his legislative duty to keep his constituents informed because his opponent must pay personally the expenses of trying to unseat him. In essence, this argument proposes to muzzle all Members of Congress since plaintiffs themselves recognize the substantial expenses involved in volume-mailing. To limit the free flow of information between Congressmen and those they represent would have grave consequences on our form of government and the freedoms it is designed to protect. The restrictions plaintiffs would impose have far graver implications than any benefits which might be gained from equalizing certain opportunities for political adversaries. Of course, a newsletter could become blatantly political campaign literature. The line might be a fine one in some cases, but here it has not been crossed by Congressman Williams' "Washington Report."

■ I conclude "Washington Report" is "correspondence . . . upon official business." Correspondence is "communication by letters; also, the letters

exchanged."[8] Letters are "written or printed messages."[9] The "Reports" fall within these definitions. The plaintiffs have seized on the words "letters exchanged" and argue that the newsletter cannot be correspondence unless sent in response to a specific request for information. This is the equivalent of saying that because automobiles move in both directions on some streets, a one-way street carries no traffic at all. Moreover, the "Reports" have repeatedly requested replys and responses so that the one-way analysis is completely unjustified.

Plaintiffs also suggest that correspondence in volume loses its identity and becomes something else. However, correspondence is not defined in numerical terms. Whether information to a constituent is imparted by an individually typed letter or by one of a hundred thousand printed letters, it is still information and the vehicle which carries information is correspondence.[10] An examination of the "Reports" show they have been issued to keep the residents of Congressman Williams' district informed as to his activities and opinions. Thus, there has been no abuse of the frank. See Strauss v. Gilbert, 293 F. Supp. 214 (S.D.N.Y.1968).[11] See also Hoellen v. Annunzio, 348 F.Supp. 305 (N.D.Ill., 1972), for a similar result as to a questionnaire mailed to a Congressman's current district. For both philosophical and strictly legal reasons distribution of the "Washington Report" constitutes official correspondence.

■■ The mailing of eight editions of "Washington Report," including the one of June, 1972, could not violate the

8. Webster's Seventh New Collegiate Dictionary, page 187 (1970).

9. National Association of Letter Carriers v. Independent Postal System of America, Inc., 336 F.Supp. 804, 808–809 (W.D.Okl. 1971).

10. But see Schiaffo v. Helstoski, 350 F. Supp. 1076 (D.N.J.1972) in which the

Honorable Leonard I. Garth, United States District Judge, reached the opposite conclusion, pp. 16–24 of the slip opinion, and ruled that 39 U.S.C. § 3210 does not authorize franked distribution of Congressional newsletters.

11. Strauss relied on 39 U.S.C. § 4161(2) which was subsequently enacted as 39 U.S.C. § 3210(2).

franking statutes. These issues were taken from the Congressional Record.[12] See 39 U.S.C. § 3212 (footnote 2, supra). Seven of them, including the June, 1972, edition, were verbatim transcripts of speeches made in the House.[13] The April, 1971, issue was included under the Extension of Remarks privilege [14] by which Congressmen may modify and enlarge a prior statement. A minimum of 3½ days elapsed between inclusion of each edition in the Record and its mailing.[15] The format and type used in the "Reports" differ from the printed Record, but the wording is identical. Parts of the Congressional Record may go out under a Congressman's frank even though a different type face has been utilized to make the copies more legible and despite the fact that pictures are included with it. Straus v. Gilbert, supra. In *Straus*, the court pointed out that it could not tell Congress what to print or what not to print in its journal. Moreover, as noted in McGovern v. Martz, supra, 182 F.Supp. at p. 348, distribution of portions of the Congressional Record is a convenient and reasonable method of informing constituents.

The plaintiffs rely almost exclusively on Rising v. Brown, 313 F. Supp. 824 (C.D.Cal.1970). This case found an abuse of the franking privilege. Both parties were Congressmen running for the Senate. The defendant, Brown, as a member of a committee which was investigating air pollution, mailed a questionnaire on environmental issues. Later, during the campaign, a brochure containing the results of this study was mailed not just to Brown's current constituents, but throughout the state. Fifty percent of the document was devoted to matters other than the pollution survey. For example, one-eighth was devoted to Brown's opposition to the Viet Nam war. The pamphlet was not placed in the Congressional Record until *after* a temporary restraining order had been issued to stop the mailing. Hence, the California Court felt that the *Straus* case was distinguishable because the brochure was mailed to *proposed* constituents and because the Congressional Record was used in an attempt to avoid a court order. The plaintiffs base their entire argument on dicta that the Congressional Record should not be used to over-ride abuses of the franking privilege and that Members of Congress should not be allowed to insert matters into the Record just for the purpose of getting free mail. Despite this concern by the court, Congress shortly thereafter reenacted the privilege of using franked mail for the Congressional Record in the Postal Reorganization Act, P.L. 91–375, 39 U.S.C. § 3212.[16] In so doing, Congress demonstrated its intention to encourage wide distribution of the Record, despite the possibility for abuse noted in *Rising*.

Plaintiffs charge that Congressman Williams is liable in damages because he allowed his frank to be used by his campaign committee in violation of 39 U.S.C. § 3215. It is also contended that plaintiffs are entitled to damages by reason of 18 U.S.C. § 612 which requires election literature to bear the names of those responsible for its publication. There is no merit in either contention. The newsletter was prepared by the Congressman's office staff and is not campaign material. Even if the relevant issue, that of June, 1972, had been prepared by someone else and was

12. In addition, prior to December, 1968, while the Post Office still issued advisory opinions on the propriety of using the frank for various mailings, nine of the eleven "Reports" published through October, 1968, were submitted for consideration and officially approved.

13. First Affidavit of James E. Brookes, attached to Motion to Dismiss, Docket No. 16.

14. Affidavit of James E. Brookes, Administrative Assistant to Congressman Williams, Docket No. 31.

15. Supplemental Affidavit of James E. Brookes, Docket No. 32.

16. Straus v. Gilbert, supra and Rising v. Brown, supra, were decided June 11, 1968, and June 1, 1970, respectively. P.L. 91–375 was enacted August 12, 1970.

campaign material, it would not be covered by 18 U.S.C. § 612, since it was contained in a speech to the House of Representatives and the details of its drafting and preparation are privileged. United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). In addition, 18 U.S.C. § 612 is a criminal statute and a questionable basis for the obtaining of money damages.[17] As to the assertion that the frank was illegally loaned: assuming for the sake of argument that Mr. Williams' campaign committee paid for all or part of the actual printing of a newsletter which was then sent out under the Congressional frank, it does not follow that the frank was loaned to the committee unless the newsletter also went out under the aegis of the committee. There has been no indication that any of the newsletters were issued in this manner.

## THE POSTAL SERVICES' MOTION [18]

Since the franking privilege has not been improperly used, there can be no order against the Postal Service's delivering the newsletter. However, even if there had been an abuse, injunctions prohibiting handling of the "Washington Report" and granting Candidate Bowie the privilege of using the "Postal Customer Local" type of address could not be granted.

The Postal Service must deliver the mail unless an item is "nonmailable" within the definition of 39 U.S.C. § 3001.[19] As the "Washington Report" is not covered by the terms of this section, the postal authorities have the duty to forward it. 39 U.S.C. § 403.[20] The plaintiffs have admitted that the newsletter is first class mail which is not subject to discretionary inspection, United States v. VanLeeuwen, 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970), and can only be opened with a search warrant authorized by law to determine if the frank has been abused: 39 U.S.C. § 3623(d). Therefore, the Postal Service cannot be liable for obeying the statutory mandate to forward correspondence. If the postal authorities opened or detained "Washington Report", they would be placing themselves in the position of being censors of Congressional mail. If the court ordered the Postal Service to refuse to deliver "Washington Report", it would amount to the judicial branch of the government ordering the executive branch to tell members of the legislative branch what they can and can not mail. Such an order would be clearly improper

17. Compare Common Cause v. Democratic National Committee, 333 F.Supp. 803 (D.D.C.1971) with Gerbing v. I. T. T. Rayonier Incorporated, 332 F.Supp. 309 (M.D.Fla.1971) and cases cited therein. See Wyandotte Transportation Company v. United States, 389 U.S. 191, 88 S. Ct. 379, 19 L.Ed.2d 407 (1967).

18. The government has contended that the postmaster general is an improper party since 39 U.S.C. § 401(1) requires suit against the Postal Service. Hence, it argues that this action against defendant, Klassen, is barred by sovereign immunity because no consent has been given. A simple and nonprejudicial amendment of the complaint joining the Postal Service will cure any possible defect. Hence, it will be ignored.

19. Non-mailable matter consists of the following:
1. Some items such as lottery tickets, counterfeit coins or securities, pornography, firearms, poisons, and explosives are prohibited by certain criminal statutes: 39 U.S.C. § 3001(a).
2. Articles which exceed the size and weight limitations or are perishable within the time to transport and deliver them: 39 U.S.C. § 3001(c).
3. Certain forms of solicitations: 39 U.S.C. § 3001(d).
4. Certain contraceptive advertisements: 39 U.S.C. § 3001(e).
5. Motor vehicle master keys: 39 U.S.C. § 3002.

20. The Postal Regulations recognize this obligation. 39 C.F.R. 137.9(a). Official mail is not to be detained even if an abuse of privilege is apparent. In this event delivery is completed but a report of the indicated problem is forwarded to the appropriate office for action. The result could be administrative collection of the postage due from the offender or prosecution under 18 U.S.C. § 1719, which provides criminal penalties for abuse of the frank.

and beyond the authority of this court under the separation of powers contained in the Constitution. " . . . [J]ust as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers." Hutchson v. United States, 369 U.S. 599, 622, 82 S.Ct. 1005, 1017, 8 L.Ed.2d 137 (1962). There can be no injunction prohibiting the Postal Service's delivery of the "Washington Report".

The other relief sought against the Postal Service is an order allowing the plaintiff to use the address "Postal Customer Local".[21] However, the authorizing regulation was adopted pursuant to 39 U.S.C. § 401(2) to aid the handling of franked mail. The broadest of the sections authorizing use of the frank, 39 U.S.C. §§ 3210 and 3211, are limited to the Vice President, members and members-elect of Congress, and certain official employees of the House or Senate. Other sections such as 39 U.S.C. § 3212 are limited to Members of Congress. The plaintiffs are not in any of the named categories and cannot use the frank. Therefore, even if they personally pay the postage, they are not entitled to use the simplified address adopted to implement the franking statute. Candidate Bowie claims that allowing a special address to ease Congressional correspondence to constituents constitutes a violation of equal protection through the due process clause of the Fifth Amendment.[22] This is claimed

to follow because the plaintiffs must expend campaign funds and maintain address listings to counter the "Washington Report." Such straining for a Constitutional argument fails because the statutes and regulations do not present a "patently arbitrary classification utterly lacking in rational justification." Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). The simplified address eases communication by elected representatives with those represented. Although it is safe to assume that individually addressed mail will not reach the same households as the "Postal Customer Local" designation, this does not render the classification arbitrary. It was adopted to meet a specific need of the Congress and its members and is obviously the easiest way for a representative to reach the people in his district.[23] The Postal Service is required to provide the types of mail service to meet the needs of the different categories of users: 39 U.S.C. § 403(b)(2). The elected members of the House of Representatives are clearly such a class. On the other hand, candidates have no special reason to be considered a separate group. Their positions are temporary and they do not represent anyone. Hence, there is a rational basis for the regulation despite plaintiffs' claims. In this situation, the courts will show deference to administrative orders implementing a statute and, if there is a reasonable interpretation, the courts will respect the ruling. Griggs v. Duke Power Company, 401 U.S. 424, 433–434, 91 S.Ct. 849; 854–855, 28 L.Ed.2d 158 (1971); Udall v. Tallman, 380 U.S. 1,

21. Mail so addressed is delivered to:
   a. Each boxholder or family on a rural or star route.
   b. Each post office box holder.
   c. Each stop or possible delivery on city carrier routes. 39 C.F.R. 122.4(d)(2). This distribution eliminates any need to maintain a name and address list. In addition, new residents, who are not yet on any list are contacted and those who have moved away are not bothered because such mail is not forwarded.

22. The Fifth Amendment does not contain or incorporate the equal protection clause

of the Fourteenth Amendment which applies to the states. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Accordingly, the claim will be treated as one involving the due process provision of the Fifth Amendment. United States v. Cook, 311 F. Supp. 618, 621 (W.D.Pa.1970).

23. I note that the Senate does not use the simplified address. It did not want it. See 5 Loyola of Los Angeles L.Rev. 52, 69–70, n. 88 (1972).

636

16–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965). See also Red Lion Broadcasting Company v. F.C.C., 395 U.S. 367, 381. 89 S.Ct. 1794, 1801–1802, 23 L.Ed. 2d 371 (1969). Accordingly, there can be no relief against the Postal Service.

As shown above, the plaintiffs have no basis for any recovery. Therefore, there is no need to consider the arguments of either candidate concerning standing, justiciability or the Speech and Debate Clause of the Constitution.