**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James A. WOMACK,
Defendant-Appellant.**

No. 80–7796.

United States Court of Appeals,
Fifth Circuit.
Unit B

Aug. 31, 1981.

Rehearing Denied Oct. 8, 1981.

John H. Alsbrooks, Jr., Levine & Levine, Birmingham, Ala., for defendant-appellant.

Michael B. Rasmussen, Holly L. Wiseman, Asst. U. S. Attys., Birmingham, Ala., for plaintiff-appellee.

Before FRANK M. JOHNSON, Jr., HATCHETT, Circuit Judges, and SCOTT *, District Judge.

FRANK M. JOHNSON, Jr., Circuit Judge:

James A. Womack appeals from his conviction, after trial by jury, on six counts of knowingly engaging in the business of manufacturing explosive materials without a license in violation of · 18 U.S.C.A. § 842(a)(1).[1] The explosive materials manufactured by Womack were M-80's, which have the general appearance of oversized firecrackers and are 50 to 75 times more powerful than legally salable firecrackers, according to the evidence presented by the Government.

Womack advances on appeal several grounds of error. First, he asserts that 18 U.S.C.A. § 841,[2] which defines "explosive materials" and "explosives" and further authorizes the Secretary of the Treasury to list additional explosives, unconstitutionally delegates legislative power to the Secretary. Second, he contends that the definition of "explosives," as provided in Section 841(d) and the Treasury Secretary's list, is unconstitutionally vague. Third, he maintains that the district court erred in denying his motion for a new trial based on alleged violation of the sequestration rule, Fed.R.Evid. 615. Fourth, he submits two arguments related to the indictment: that the indictment was multiplicious and that there was a factual variance between the indictment and the evidence. Fifth, he challenges the admission of certain evi-

dence. Finally, he protests that the evidence was insufficient to support his convictions. We affirm.

The explosive materials described in the indictment as supplemented by a bill of particulars were "M-80 explosives (firecrackers) generally containing mixtures of aluminum powder, sulphur and potassium perchlorate." The indictment contained six counts, each of which covered a separate location in rural northern Alabama. Each count also covered a different time period, although some time periods overlapped. The six counts covered the following time periods: Count I—July and August 1975; II—August and September 1975; III—June 1976 through November 1978; IV—June 1976 through August 1976; V—June 1977 through September 1977; and VI—September 1977 through December 1978. The M-80's were clandestinely manufactured and stored in a variety of rural locations by untrained and unsupervised personnel hired by Womack. Several of those persons testified for the Government at trial. Womack's pretrial motions to dismiss the indictment and to suppress were denied. His post-trial motion for a new trial was also denied.

Womack makes a two-pronged unconstitutional delegation argument: first, that the statutory scheme does not provide adequate standards or safeguards to guide and control the Treasury Secretary's listing of explosives, and, second, that the doctrine of the separation of powers is violated because the power of defining the crime is vested in the prosecutorial agency.

---

\* District Judge of the Middle District of Florida, sitting by designation.

1. 18 U.S.C.A. § 842(a)(1) provides:
 (a) It shall be unlawful for any person—
 (1) to engage in the business of importing, manufacturing, or dealing in explosive materials without a license issued under this chapter;

2. 18 U.S.C.A. § 841 provides in pertinent part:
 (c) "Explosive materials" means explosives, blasting agents, and detonators.
 (d) Except for the purposes of subsections (d), (e), (f), (g), (h), (i), and (j) of section 844 of this title, "explosives" means any chemical compound mixture, or device, the primary or

common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters. The Secretary shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this chapter. For the purposes of subsections (d), (e), (f), (g), (h), and (i) of section 844 of this title, the term "explosive" is defined in subsection (j) of such section 844.

█ Congressional legislation which prescribes essential standards and basic legislative policy and delegates to an administrator authority for promulgation of rules and regulations is constitutionally permissible, provided the standards are "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator ... has conformed to those standards." *United States v. Roya*, 574 F.2d 386, 392 (7th Cir.), *cert. denied*, 439 U.S. 857, 99 S.Ct. 172, 58 L.Ed.2d 165 (1978), *quoting Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944). The standards of the statute are not to be tested in isolation but must derive meaningful content from the purpose of the statute and its factual background and the statutory context in which the standards appear. *American Power & Light Corp. v. Securities & Exchange Comm'n*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

Womack's delegation argument is based upon *United States v. Gordon*, 580 F.2d 827 (5th Cir. 1978), *cert. denied*, 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979), which rejected an analogous challenge to the Drug Abuse Prevention and Control Act of 1970, 21 U.S.C.A. §§ 801–966. In that Act Congress delegated the power to schedule drugs as controlled substances to the United States Attorney General, 21 U.S.C.A. § 811, and the Attorney General sub-delegated that authority to the Drug Enforcement Agency (DEA).[3] Pursuant to Section 811(a) the Attorney General may schedule a drug if he finds that it has a "potential for abuse" and if he makes the findings required by Section 812. Control proceedings under Section 811(a) can be initiated by the Attorney General only after he receives from the Secretary of Health, Education and Welfare a scientific and medical evalu-

ation and recommendation that a drug should be controlled. 21 U.S.C.A. § 811(b). The Attorney General's finding that a drug has a potential for abuse must be supported by substantial evidence. 21 U.S.C.A. § 811(b). The Attorney General must also consider certain criteria provided in Section 811(c) in determining whether to control a drug. Further criteria must be met for the particular scheduling of a drug once it is determined that such drug should be controlled.[4]

The *Gordon* Court began its analysis by stating that

> when considering an attack on congressional delegation, we must not only examine the entire Act to determine what standards, if any, have been provided but also whether such standards are sufficiently definite in light of the complexity of the area at which the legislation is directed and the susceptibility to change of the area in question, *Carlson v. Landon*, [342 U.S. 524,] 542, 544, 72 S.Ct. 525, 535, 536, 96 L.Ed. 547 [(1952)]; *see Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271 [1281], 14 L.Ed.2d 179 (1965).

580 F.2d at 839. The Court also noted that the Supreme Court has held that the standards provided by Congress in its delegation of authority may be broad because Congress is required to legislate only insofar as "reasonable and practicable." 580 F.2d at 839, *quoting Carlson v. Landon*, 342 U.S. 524, 542–43, 72 S.Ct. 525, 535–536, 96 L.Ed. 547 (1952). The *Gordon* Court concluded:

> Although there may be some ambiguity in the Act's standards, we believe these standards are sufficiently precise to apprise the delegatee of the circumstances under which a particular drug may be controlled. Moreover, given the constant changes in the area to be regulated, more

---

**3.** The *Gordon* Court did not find the subsequent sub-delegation to be significant for the purpose of its analysis. It noted first that because the DEA received no greater authority than that granted to the Attorney General by Congress it was limited by the same statutory standards governing the Attorney General and second that "subdelegation of power is not inherently invalid." 580 F.2d at 840 n.6.

**4.** Scheduling a controlled drug determines the circumstances under which that drug can be manufactured, distributed, and used, as well as the penalties for unauthorized manufacture, distribution, or possession.

precise standards could not be drawn without undermining the Act's purpose. Finally, there are sufficient safeguards against the arbitrary control of drugs. 580 F.2d at 840.

■ We reject Womack's assertion that Title XI of the Organized Crime Control Act of 1970, which establishes federal regulation over explosives,[5] does not provide the Secretary of the Treasury with adequate standards or safeguards to control the listing of explosives. Title XI carefully defines the term "explosives" as "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion" and an illustrative list of subject explosives is provided. 18 U.S.C.A. § 841(d). The Treasury Secretary listed as an explosive material the substance "explosive perchlorate mixture." The standards are sufficiently definite given the complexity and nature of the area to which the legislation is directed. *United States v. Gordon, supra,* 580 F.2d at 839.

Womack further suggests that the lack of controls and standards is demonstrated by the Treasury Secretary's departure from the legislative purpose of Title XI. He insists that the legislative purpose was to prevent bombings. Although the occurrence of numerous bombings in this country during the 1960's apparently alerted Congress to the need for Title XI, which regulates the importation, manufacture, distribution, and storage of explosive materials, the legislative intent demonstrates that Congress also intended Title XI to apply to any intentional misuse or any unsafe practice concerning explosives.[6]

■ The second prong of Womack's delegation argument is that the doctrine of separation of powers is violated by delegation of the power to define explosives to the prosecutorial agency. A similar contention was rejected in *United States v. Gordon, supra,* 580 F.2d at 840. The Court in *Gordon* first cited the rule that "a delegatee may formulate rules for violation of which the statute itself provides penalties imposable by judicial process." *Id.* (citations omitted). The Court noted that the DEA, the delegatee, was provided carefully limited and defined authority and that Congress ultimately is responsible for scheduling drugs. *Id.* The Court also found it significant that the DEA did not have wide discretion to define criminal conduct and, furthermore, that the defendant was not

---

5. The statutory section under which Womack was convicted is Section 842, which is part of Chapter 40 of Title 18, United States Code Annotated, 18 U.S.C.A. §§ 841–848. That chapter was enacted as Title XI of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, § 1102(a), 84 Stat. 952 (1970).

6. The legislative history of Title XI states:
Explosives control
Bombings and the threat of bombings have become an ugly, recurrent incident of life in cities and on campuses throughout our Nation. The absence of any effective State or local controls clearly attest[s] to the urgent need to enact strengthened Federal regulation of explosives.
Title XI ... responds to a widespread national concern that existing Federal and State sanctions and prohibitions over the use, possession, and transportation of explosives are inadequate.
\* \* \* \* \* \*
Title XI combines the regulatory approach to the distribution and storage of explosives with strengthened and expanded criminal prohibitions that apply to the intentional misuse of explosives. Its purpose is to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage. It is also intended to assist the States effectively to regulate explosives distribution within their borders. It is not the purpose of this provision to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, storage or use of explosives for legitimate industrial, mining or agricultural purposes.
\* \* \* \* \* \*
However, it is not the intention of the proposed statute that the Federal Government substitute for the enforcement activities of State and local authorities. Express provision is made that this statute shall not be construed as preempting State law or depriving State or local law enforcement of its responsibilities for investigating and prosecuting crimes involving the use of explosives. H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad. News 4007, 4013–14.

forced to act without notice of the specific conduct that was prohibited. *Id. See also United States v. Pastor*, 557 F.2d 930, 941 (2d Cir. 1977) (delegation of authority to Attorney General to schedule substances under Comprehensive Drug Abuse Prevention and Control Act of 1970 not inherently unfair delegation to prosecutor, because Attorney General's discretion not unfettered and defendants made no colorable showing of bad faith in prosecution). We conclude, under the analysis of this Court in *Gordon*, that the doctrine of separation of powers was not violated in this case. The discretion of the Treasury Secretary is sufficiently limited by statutory scheme and Womack was provided sufficient notice by the Treasury Secretary's promulgation of his list of explosives that unlicensed manufacture of explosive perchlorate mixtures was forbidden.

Womack's second claim is that the definition of explosives in Title XI is unconstitutionally vague. A criminal statute must be sufficiently definite to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" and to avoid the possibility of arbitrary and erratic arrests and convictions. *Papachristou v. City of Jacksonville* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971). The language of the statute need not be mathematically precise; it need only give fair notice and warning of the proscribed conduct, in light of common understanding and practices. *Grayned v. City of Rockford*, 408 U.S. 104, 110–14, 92 S.Ct. 2294, 2299–2302, 33 L.Ed.2d 222 (1971); *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir.), *cert. denied*, 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980).

Section 841(d) carefully defines "explosives" as "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion." Section 841(d) further notes that "the term includes, but is not limited to, dynamite and other high explosives . . . ." The list of explosives that was promulgated by the Treasury Secretary pursuant to Sec-

tion 841(d) included "perchlorate explosive mixtures." Womack's M-80's were composed of such a mixture, the primary or common purpose of which was to function by explosion.

Womack contends that the Treasury Secretary's list did not specifically include "M-80's" or "fireworks." In support of this contention, Womack relies upon *United States v. Insco*, 496 F.2d 204 (5th Cir. 1974), which held that a criminal statute that required attribution of certain campaign materials was ambiguous concerning whether a campaign bumper sticker was encompassed by the terms of the statute. The notice problem in *Insco* was raised by the "unusual concatenation of three interrelated factors": (1) a complete silence in the legislative history concerning bumper stickers; (2) a universal practice by candidates of not affixing attribution clauses to bumper stickers; and (3) the total absence of prosecutions concerning bumper stickers. The *Insco* Court noted that "[u]ndeniably, criminal statutes may be construed in such a way that they will apply to situations previously deemed beyond the measure's intended compass. *See, e. g., Bouie v. City of Columbia*, 1964, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894." *Id.* at 209.

In this case, as discussed earlier, the legislative history demonstrates that the purpose of the statute is to regulate the manufacture, distribution, storage, and misuse of explosives.[7] Womack also contends, analogous to the second factor in *Insco*, that the control of fireworks has been traditionally left to the states. He cites 18 U.S.C.A. § 836, which prohibits the transportation of fireworks into a state prohibiting the sale of such fireworks and which also provides that state law shall define fireworks. However, M-80's are not, according to the Government's evidence, mere firecrackers; they are 50 to 75 times more explosive than legally salable firecrackers.

Relying upon the third factor in *Insco*, Womack stresses that there are no reported prosecutions pursuant to Section 842(a)(1)

7. *See* note 6 *supra.*

for manufacture of M-80's or fireworks. Womack argues that he was not put on notice that his conduct was prohibited because the Secretary's list included only "perchlorate explosive mixtures" and did not include M-80's, firecrackers, fireworks, or any of the chemical ingredients used by him in his M-80's: aluminum powder, sulphur, or potassium perchlorate. However, Womack manufactured his M-80's from what he knew to be an explosive perchlorate mixture. He further relies upon the doctrine of *ejusdem generis* in support of his assertion that he was not provided adequate notice, arguing that the broad or general term "explosives" in Section 841(d) must be construed in light of the narrow or specific kinds of explosives listed in that section. Section 841(d), however, expressly provides that "the term [explosives] includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives . . . ."

We do not find Womack's assertion that the statute is void for vagueness persuasive. The Secretary's list included perchlorate explosive mixtures and the explosive element of Womack's M-80's consisted of such a mixture. The definition of explosives given in Section 841(d), as supplemented by The Treasury Secretary's list, was sufficiently explicit and precise to put Womack on notice that his manufacture of explosive devices containing an explosive perchlorate mixture was proscribed.

■ Womack's third contention is that the district court erred by denying his motion for a new trial based on alleged violations of the sequestration rule, Fed.R.Evid. 615. At the request of both parties Federal Rule of Evidence 615 was invoked and all witnesses were sequestered. However, the trial court did not instruct the witnesses not to discuss the case or testimony among themselves and no objection was made to the court's failure to so instruct the witnesses. Two government witnesses admitted after trial in affidavits that the witnesses sequestered in the government's witness room had, while sequestered, discussed the testimony of prior witnesses, prospective answers to anticipated questions, and the case in general as well as their association with Womack. Two Bureau of Alcohol, Tobacco, and Firearms agents were present in the government's witness room but did not participate in the conversations.

■ In order to justify reversal for violation of the sequestration rule, the defendant must show sufficient prejudice. *United States v. Warren*, 578 F.2d 1058, 1076 (5th cir. 1978) (en banc) (insufficient prejudice shown where trial court failed to exclude government witness from courtroom during suppression hearing), *modified on other grounds*, 612 F.2d 887 (5th Cir.) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. Eastwood*, 489 F.2d 818, 821 (5th Cir. 1973) (trial court's failure to declare mistrial where witnesses who had violated sequestration orders nevertheless testified did not justify reversal on appeal absent showing of prejudice sufficient to constitute abuse of discretion). The determination whether to declare a mistrial or to order a new trial for violation of Rule 615 is a matter within the trial court's sound discretion. *United States v. Eastwood, supra*, 489 F.2d at 821.

We conclude that Womack was not so prejudiced by the alleged violation of Rule 615 that a new trial is required.[8] The prosecution witnesses' testimony at trial was

8. The Government submits that there has been no violation of Rule 615 because that rule does not require that witnesses be instructed not to discuss the case; rather, it merely requires that witnesses be excluded from the courtroom. *See United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978) (new trial granted on other grounds), *on appeal after new trial*, 600 F.2d 149 (8th Cir. 1979), which held that the determination whether or not to instruct sequestered witnesses concerning communications with other witnesses after they have testified is within the trial court's sound discretion. 578 F.2d at 1235. We do not decide the issue whether the trial court's failure to instruct the sequestered witnesses not to discuss the case, where the parties did not request that such restrictive conditions be placed on the sequestration order, is a violation of Rule 615. For the purposes of this opinion, we have assumed that the Rule was violated.

uncontradicted, corroborated by other evidence, and consistent with prior statements of those witnesses. Those witnesses stated in their post-trial affidavits that their trial testimony was truthful. Moreover, the trial judge, in denying Womack's motion for a new trial, rejected his assertion that the demeanors of the government's witnesses were affected by their discussion of the case in the witness room.

■ Womack next urges that the trial court erred in refusing to dismiss the indictment for multiplicity. His position is that the indictment describes only one larger, continuing course of conduct rather than a separate course of conduct at each location. Womack was charged in each of the six counts with being engaged "in the business of manufacturing explosive(s)" without a license. The statute, 18 U.S.C.A. § 842, requires a course of conduct—manufacturing—rather than specific acts.

We agree with the Government's position that the distinctions among the charges contained in the counts sufficiently support the indictment's differentiation of separate courses of conduct as expressed in different counts. The distinctions were both spatial (different geographical locations) and temporal (different time periods, even though some time periods overlapped). Womack's reliance upon *United States v. Woody Fashions, Inc.*, 190 F.Supp. 709 (S.D.N.Y. 1961), is misplaced. That case concerned a statute which prohibited a certain course of conduct while the indictment charged specific acts, whereas here each count charged a separate course of conduct, not separate acts.

■ Womack also asserts that there was a factual variance between the indictment, as supplemented by the first bill of particulars, and the proof at trial. The indictment as supplemented by the bill of particulars charged Womack with manufacturing without a license "M–80 explosives (firecrackers) generally containing mixtures of aluminum powder, sulphur, and potassium perchlorate." The proof at trial showed that Womack manufactured M-80's and that the M–80's were explosives that consisted of a perchlorate explosive mixture and generally contained aluminum powder, sulphur, and potassium perchlorate.

■ The proper inquiry is not whether there has been a variance in proof but rather whether there has been such a variance as to affect the substantial rights of the accused. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). Variance from the indictment is not always prejudicial nor is prejudice assumed. *United States v. Canales*, 596 F.2d 664, 670 (5th Cir. 1979). In *Canales* this Court held that there was no prejudice to the defendant from a variance where he had adequate notice of the charges against him to prepare his defense. Assuming arguendo that a variance existed in this case, we discern no prejudice to Womack; he was provided with sufficient notice of the charges against him.

Womack also challenges certain evidence obtained in a search of a third party's property. An affidavit in support of a search warrant executed for the residential property of Jackie Melton mentioned Womack's name, stating that no license for the manufacture of explosives at Melton's residence had been issued to Melton, Womack, or Womack's wife. Melton's property was the location of the activity charged in Count III of the indictment. Womack's motion to suppress the evidence obtained from Melton's residence was denied on the ground that he lacked standing.

■ In order to have standing to bring a motion to suppress evidence obtained in a search of a third person's property, a defendant must demonstrate a legitimate expectation of privacy in that person's property. *United States v. Salvucci* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The mere mention of Womack's name in the search warrant did not confer upon him any legitimate expectation of privacy in Melton's property, and Womack had no other interest, possessory or otherwise, in that property.

■ Womack also protests that the trial court erred in admitting the results of the

search of Melton's property because the time of the search, June 1979, was too remote from the time of the activity charged, June 1976 through November 1978, and because the items seized had been previously moved, altered or partially destroyed. This contention is meritless. The items seized were the instruments of the crime, the evidence reflected that they were not substantially changed, and those changes that had occurred were indicated to the jury.

 Finally, Womack maintains that the trial court erred in denying his motion for judgment of acquittal on the basis of insufficient evidence. The proper standard of review was stated by this Court in *United States v. Marx*, 635 F.2d 436 (5th Cir. 1981):

> In reviewing the sufficiency of the evidence, we must view all the evidence, direct and circumstantial, in the light most favorable to the government, and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. The standard of review is whether a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt.

*Id.* at 438 (citations omitted). The test for evaluating the sufficiency of the evidence is the same whether the evidence is direct or circumstantial. *United States v. Dwoskin*, 644 F.2d 418, 420 (5th Cir. 1981).

As to all counts Womack claims that there was no evidence that the M–80's contained "explosive perchlorate mixtures" because no physical evidence or substantial evidence concerning the specific ingredients was introduced. However, the Government's proof at trial demonstrated that Womack's M–80's were made from aluminum, sulphur, and potassium perchlorate, and that those combined ingredients constituted an explosive perchlorate mixture. As to Count IV, he asserts that there was no

actual testimony that M–80's were manufactured at the location covered by that count. The Government's evidence showed that Womack built a shed on the property to which Count IV related and moved chemicals and equipment that are used in manufacturing M–80's to that location and, further, that workers at that location were engaged in one of the steps in making M–80's. Viewing the evidence in the light most favorable to the Government and accepting all reasonable inferences that tend to support the jury's verdict, we conclude that the evidence that Womack manufactured M–80's at Melton's property was sufficient to sustain his conviction on Count IV.

As to Counts V and VI, Womack claims that the evidence shows only that fusing and finishing of the M–80's took place at the locations covered by those counts. However, the evidence demonstrated that other manufacturing processes were undertaken at those locations.[9] We agree with the Government's position that the evidence was sufficient to sustain Womack's convictions on those counts.

AFFIRMED.

---

**9.** We do not address the Government's contention that evidence of the fusing and finishing

activities alone constitutes sufficient evidence.